Next case is number 22-1059 Simmons v. Perry  Good morning, your honors, and may it please the court. My name is Isabel Aubryn, and I represent Mr. Augustus Simmons, the appellant in this matter. I'd like to request two minutes for rebuttal. Richard Can we start off with the question that we asked of counsel at the outset earlier this week relating to do we have jurisdiction? Absolutely. Yes, your honor. As a threshold matter, this court does have appellate jurisdiction. A review of both the memorandum opinions in the motion to dismiss and summary judgment phases make clear that all claims were disposed of and that nothing remains pending. Told otherwise would be to thwart the efficient administration of justice, where the effect would be to simply send these claims back to the district court, which considered them in the first instance. Though the language of the order is somewhat confusing, substantively the district court judge dismissed in part count one and dismissed in whole counts two and three. Richard Count two as well? Isabel Count two as well. Yes, your honor. Richard Where's that? Isabel That's at pages 425 to 427 of the joint appendix in the substantive analysis of the case as well as the heading.  All right. Why don't you quote for us the order and what it says as to count two? Isabel As to count two, I believe I don't have the exact language in front of me, but I believe the language on page 425 says that count two was in the heading dismisses dismisses it because there's not enough to account for an allegation of conspiracy against the named defendants there. It's a page 425 to 426.  And what what document is that? Isabel That is the most the memorandum opinion for the motion to dismiss. Richard Yeah, that's not an order. Isabel OK. Richard The final order rule requires it to be an order, not an opinion. So if the opinion says counts one, two, three, four and five are dismissed and the order says counts one, three, four and five are dismissed, count two is never dismissed. That's what we're dealing with here. That's the problem. Isabel OK. Yes, your honor. I understand. Richard So there's no order. Isabel The order Richard Count two. Isabel By our interpretation, the order is a Scrivener's error because of the substantive analysis in count in the memorandum opinion as to count two. That's our that's that's the party's interpretation of it. Richard That may be right. I think you perhaps have given an accurate factual description of what happened here. The problem is the final order rule is pretty strict for good reason, because we need to know what we have jurisdiction over and the district courts know they have to enter final orders. Isabel I understand. Richard Do you have any case law that that would vitiate what I just said or? Isabel No, your honor. I don't have any case law specifically on that point. If this court is inclined to define it doesn't have appellate jurisdiction on this matter, we would ask for the opportunity to submit supplemental briefing to more fully answer that question. But as to the party's interpretation, as your honor says, it is a description of the facts of the the opinions and the motion for summary judgment then disposed of all remaining claims. Richard We have a similar problem, I think, with the Smiths, right? Because there were two Smiths, Tracy and Kimberly, and and the district court referred to the generic Smith in the singular rather than dealing with both of them. Correct?  This is for for which count, your honor? Count one, one of the DOC defendants in count one, I think, was Kimberly Smith. And then in count five, count five was Tracy Smith. Yes. And and count. So Kimberly Smith is medical personnel working for the Department of Corrections. And so she is named in the counts that correspond to the excessive force and deliberate indifference claims relating to the grievance 777430. Tracy Smith is implicated in the counts pertaining to religion claims. Okay. All right. Well, you've done a lot of work on the substantive issues and perhaps my initial impulse is mistaken. So why don't you address the weighty substantive issues that you've greased? Thank you, your honor. The district court committed reversible error when it entered summary judgment for failure to exhaust on Mr. Simmons claims on the First Amendment RLUIPA and Eighth Amendment claims. The district court likewise committed error when it entered summary judgment for medical defendants because fact questions remain as to their deliberate indifference. I'll start with Mr. Simmons religion claims. As a matter of law, Mr. Simmons exhausted his First Amendment and RLUIPA claims when he completed the prison's 819 process. It's a process for raising issues with religious accommodation while incarcerated. A prisoner must exhaust administrative remedies as they are defined by the prison, as they're held out by the prison. And here, the 819 process is precisely that. So determining what a prisoner in fact has to do in order to properly exhaust, this court has made clear that that's an exercise in statutory interpretation. We look to the text of the- Your opposing counsel, I'm talking about the religious claim for the moment, says that you look to ADM 819 for exhaustion purposes when it's a request for prospective relief and makes a difference, a differentiation between prospective and retrospective relief. Do you buy that argument? Not entirely, Your Honor. My understanding of the 819 process is that it gives prisoners an opportunity to raise issues with their It takes them through a series of increasingly higher levels of review, all the way up to the regional deputy secretary. Any ordinary prisoner confronting that language would be correct to think that it's sufficient to exhaust those claims. And particularly as to this question of interpretation of the text of the policy, the 819 process makes a distinction between the grooming-related requests and non-grooming-related requests. It's on the non-grooming, it's silent. On grooming, it specifically says what you need to do. Precisely, Your Honor. But not grooming, it's silent. So how do we interpret that? We can interpret that consistent with canon of statutory interpretation, expressio unius, exclusio alterius, the expression of language in one place- They want us to exclude all others? I would like you to, yes. Yeah, that sounds like you. And I think you should. I think that would be- I forgot all my Latin from- I'll say it in English. From being an older boy, so. The expression of language in one part of the policy, but its exclusion elsewhere, should be given effect. Here, Mr. Simmons was correct to note that at the conclusion of, upon receiving a denial for his non-grooming request, there was no instruction to do anything further. So by the plain language of that policy, he had exhausted. It was, to use this Court's language, a parallel process, parallel for the purposes of exhausting under the PLRA. And- It might have been reasonable for him to think that, but wouldn't he be taking a risk in of what Justice Kagan wrote for the Court in Ross v. Blake? You know, she said there that basically, when in doubt, exhaust. When in doubt, file a grievance. But I guess your response is, he had no doubt. My response is that Justice Kagan's language is, a prisoner should be erring on the side of exhausting when there are multiple reasonable interpretations. And I think that qualifier is important here because they're interpreting the absence of an instruction to do something as an interpretation. That's not a reasonable interpretation. There was no instruction for a prisoner with a non-grooming requirement to move on to the 804 process. In fact, it would be illogical to think that in that silence, that a prisoner should do the opposite of what the text of the policy says. Well, but the 819 doesn't make clear that you've exhausted. It's ambiguous, isn't it? I think you've made a good argument that when you consider how high up the management chain the 819 review goes, that there's something incongruous about going down to lower level officials under an 804 grievance, the standard grievance. And the district court judge noted that point as well. But right. But the district judge was unmoved. And I think the reason the district judge was unmoved is because everybody knows that if you're a prisoner and you've got a problem with something that's happening, you file under 804. And isn't it also possible that in light of the LUIPA and a lot of the religious liberty cases coming out of the prison context, isn't it also reasonable to believe that the prisons would want to create a structure that would require higher level review for those more challenging, difficult religious liberty cases like your client's claim, as opposed to the grievance? Well, I will say, Your Honor, that the prison did not. It is certainly true that the prison might want to do that. That's nowhere in the record. It's also not an argument made by corrections defendants. So to the extent that that is how they'd like the grievance policy to function in their larger administrative scheme, that's certainly within their purview. But here, there's no dispute that it was an unwritten requirement. And so in the first instance, that's exhaustion as a matter of law by the pure text of 819. But if it's not, then what Your Honor has just described is an opaque scheme. Wait, you went a little fast for me there. How is it an unwritten requirement? So in the... When 804 is a written requirement to grieve, 819 is a written requirement to pursue the non-grooming religious liberty issue. The unwritten part is the purported interaction between the two. So once a prisoner has received a denial under 819, any instruction that they ought to move on to 804, that doesn't exist. Corrections defendants characterize that as common sense. It doesn't say don't go. It doesn't say go under 804. That's why I suggested it seems ambiguous. It seems debatable. And if it's debatable, I look at Ross v. Blake, which seems to say if it's debatable, go to 804. I would... And your client... Isn't it true that your client has had... He's a frequent flyer. He's had numerous grievances. He knows how to file grievances under 804. It's absolutely true that he has filed grievances under 804 on unrelated matters where seeking a religious accommodation, he has exclusively used the 819 process because of the way that it is written, because of the way the DOC holds it out for that purpose, and because there's no instruction for him to have done anything else. If that's not a parallel process on its text, then at least it's an opaque scheme, because there's no way for a prisoner to divine what is required of him. All right. Good. Good. So let's talk about opacity. Doesn't the standard require it to be, quote, essentially unavailable? Slight... Essentially unknowable, I think. And unavailable is the standard. Unavailable or essentially unknowable. Yes, Your Honor. It does. Pretty high standard. Agreed. And I think it's handily met here. This court's precedent in small, although that predates Ross, addresses the question of unavailability in the presence of an unwritten requirement. And this court held there that when the text of prison policy doesn't tell a prisoner that he should be doing something, neither the courts nor the prison can expect him to have done it. That is perfectly analogous here. And it's true that it's a high standard, but it's met to the extent that anything Mr. Simmons would have done would have been flouting the language of prison policy. Yes, it's on the books, but availability doesn't mean, is it written somewhere in a manual? It means, can a prisoner practically avail himself of that in order to exhaust within the meaning of the PLRA? And how do we know that your client could not have practically availed himself of 804, had he chosen to file under 804? Are you saying that they would have just dismissed the 804 agreements out of hand and concluded, well, you already sought relief under 819, so go away? The answer to that question is not in the record, but that is my interpretation of the arguments that correctional defendants are making, that he did have to start with 819 at a minimum, and that because of the way the hierarchical structure of the Pennsylvania Department of Justice, the final determination under 819 for a non-grooming request is the regional deputy secretary. That's not the same level that an 804 request reads, and there's no reason to think that they would be able to provide the relief sought. Ross reiterated the Supreme Court's holding in Booth that an administrative remedy does have to be capable of providing some kind of responsive action. 804, nothing about 804 suggests that it could. And I'll just, goodness, I see my time has fully elapsed. It certainly does. Well, I could continue if you're, or I could. Do you have any other questions? We'll hear you on rebuttal. Okay, thank you, your honors. Let's hear first for counsel for the medical appellees. Ms. Seabrooks? Good morning. May it please the court, my name is Kiana Seabrooks, and I'm counsel for the medical appellees, Dr. Maxa, Mr. Sutherland, and Mr. Leslie. We raise one simple argument in this appeal, which is simply that. Jurisdiction. Do you have anything to add on that? I mean, we, your friend on the other side cited the opinion of the district court, and I explained why that doesn't satisfy the final order rule. Do you have anything to show us that the final order rule has been satisfied with respect to count two? Not quite. In the opinion at ECF number 184, Judge Lanzillo specifically discussed the retaliation claim and basically found that, well, there's two claims in count two. One with respect to medical appellees and one with respect to correction appellees. With respect to us, Mr. Simmons raised a conspiracy and retaliation claim, and in that memorandum opinion on our motion for summary judgment, Judge Lanzillo specifically stated that the conspiracy and retaliation claim fell because the record shows that decisions with respect to his treatment for his asthma was made prior to him filing a grievance, and then subsequently enter the final order granting summary judgment, but never specifically stated in that final order that he was granting summary judgment as to both claims. He only stated that it's further order that final judgment in this action is entered in favor of those defendants. Right. Thank you. That's very helpful. We're reading the record the same way. Okay. The problem is final order as to all parties on all claims, that's the rule, right? Yes, but I will just add that. Unless Judge Lanzillo had done a 54B, but I didn't see any evidence of that happening in the record either. True. I think anybody asked for a 54B today. Correct. We did not request one. There is one case, Rouse v. City of Pittsburgh, in which the court specifically stated that, for instance, a conspiracy claim necessarily fails when there's no predicate denial of the complainant's constitutional rights, which is necessary for a cause of action for conspiracy. So based on the fact that Judge on behalf of medical defendants, we would naturally assume that the conspiracy claim fell on those grounds. Okay. All right. Let's give you a chance to talk about the merits, like did your friend on the other side. As I understand your argument, it's sort of the classic, we didn't do anything wrong, and if we did do anything wrong, the medical defendants did anything wrong, it was at worst malpractice, and malpractice is not actionable in this area. No. We made one simple argument, which was basically that appellant waived his appeal asked to us. Mr. Simmons raised claims of deliberate indifference based on his medical treatment, namely that he claims that medical appellees did not provide him an inhaler after his was confiscated by several correctional officers prior to the use of OC spray on September 15, 2018. The three that we're talking about now, Max Sutherland and Leslie. Yes, correct. Treated him afterwards, is that correct? Yes, and he's alleging that that treatment was delayed and result in his development of pulmonary fibrosis, which is incorrect, and then also his retaliation and conspiracy claims. These three did not know about the authorization to use pepper spray before this actually occurred. Correct. Our medical appellees were not involved in the use of OC spray during either instance, and in raising the waiver argument, we were trying to point out to the court that appellant did not raise any issues as to the grand assembly judgment in their favor with respect to his deliberate indifference claim against them. He solely focused on the deliberate indifference claim related to the use of the OC spray and his excessive force claim related to the use of the OC spray, which our defendants were not involved in. Okay. You don't get punished for finishing early. Thank you, Ms. Seabrooks. You're welcome. You're welcome. Go ahead. You still have time if you had something else to add. I was just, I don't need to add anything. Thank you. All right. Thank you. On behalf of the corrections appellees, Ms. Trovener. And could we burden you with starting with the jurist, anything to add on the jurisdictional snafu, if we could call it that? Good morning. You may please the court. I don't have anything to add with regard to jurisdiction. I will say that I think it would be a waste of judicial resources to consider, to only consider the order and not the opinion that coincides with it, that goes in depth about the claims and the defendants and what's dismissed and what's remaining. Let's assume you're correct about that. We've got an issue of judicial power, right? I mean, jurisdiction, final order rule. Are you suggesting that for practical purposes, we can say we have jurisdiction? I think the intent of the district court is clear. The opinion and order in this case is actually one document. It's all docketed together. I don't know if that's of interest to the court, but you know, the opinion goes into depth. It's a several page opinion about all of the claims. There were several defendants in this case. The court has a nice, I'm sorry. The thing that jumps out is it looks like the description on page one of the motion for summary judgment, and I'm looking at JA 460, leaves out count two, which we've talked about previously with your opposing counsel. And the district court's description on page two of its opinion, which is JA 22, leaves out in addition to count two, count five. And obviously the question is then what do we do about it? Possibly does the order cover those omissions by saying I grant summary judgment in connection with all claims or what cures the problem that we see initially on the face? I think, your honor, the district court could have cured or could still cure the error as a clerical error of sorts. It's very clear again, and I've already said this, that the opinion addresses all the counts raised. The opinion has a nice little breakdown of counts one, two, three, four, five, and six, which defendants are involved in each claim and so forth. So it's very detailed. Where does the opinion deal with counts two and five? I'm sorry? Where does the opinion deal with counts two and five? I think that the court, it was an oversight with respect to the order, the language of the order itself. But where does the opinion deal with counts two and five? If you're saying there's a problem with the order, I was trying to give you a way out, and so you're probably correct. So where does the opinion take up the slack? I'd have to find those specific page numbers for your honor, but I recall in reviewing this when the court sent the text order on Monday and speaking to opposing counsel and reading through that with a fine-tooth comb, there's specific language in there that count two is dismissed. Right. I'm not sure about that, but if you find it, let us know. Well, let's, if the case does go back, you know, we record these proceedings, maybe it'll be of help to the district court. So if we can talk about the merits, tell us about the merits, because it really is peculiar, I think. You might tell me why it's not peculiar. At first blush, it's peculiar that your regulations specifically say that for grooming religious cases, if you don't like our decision, file a grievance, and for non-grooming religious cases, you don't say that. So what's going on? I understand that, your honor, and I'll address that, but I'd like to also address the 804, which is the default grievance policy. It's our position We all know that. We've seen plenty of 804 cases. When we're looking at 819 and the way that it was broken down at the time in department policy, there was a section for grooming type requests related to one's religion, and there's a section for non-grooming related requests, which was basically everything else. As I reviewed that policy again in preparation for this court's argument, it became very clear to me why there was that distinction at the time, and I think that's clear from the language of the policy. When the department was dealing with a grooming-related request, what we're really talking about is cutting an inmate's hair or cutting their beard, and the inmate's claim is that that is religiously defiling them in some way. Well, what the department decided to do was sort of weave in the grievance process with the religious accommodation process in that set circumstances, and here's why. The inmate says, I need an exemption because my hair can't be cut for religious purposes. The department says, okay, we're going to review that through the religious accommodation process that takes place. Let's say, hypothetically, they decide to deny the religious exemption, grooming exemption. Well, at the time, they marked it as a pending denial and allowed the inmate to go through the grievance process because once you cut the hair, you can't go back. So the grievance process had to be part of that if the grievance, when the grievance process ran its course, if the inmate filed a grievance, and if the denial was upheld, then it becomes a final denial. That interplay, that complexity doesn't happen with non-grooming-related requests. Let's assume that you file for a religious accommodation under 819, which is what it's for, grooming and non-grooming, and it says that if you lose, and you go all the way up, in this case, to the regional director, if you lose, you have to wait a year before you can reapply. Wouldn't that tell you as a petitioner that, okay, I got to wait a year, not happy with it, but that's the way it is, and why would you possibly think that 804 would apply in that instance, which has a 15-day requirement after the incident takes place, which is long before you filed under 819 sometimes? Your Honor, with respect, I think that argument looks at 819 in a vacuum. We know that Mr. Simmons was aware of the grievance process. You're in that position. You're saying, okay, it's a vacuum, but you filed under 819, you lose, it's gone all the way up. It says if you lose, you got to wait a year. What makes you think that you now have to go under 804? Well, I don't think that it says if you lose, you have to wait a year. I think it says that you can reapply and seek that accommodation again. You may not reapply. You must wait a year for the prison to be right, correct? Right. So our position is, Your Honor, that that process is the process to request the accommodation. It goes through those steps. Let's say it's the grievance process kicks in. Then the inmate can file a grievance and say, wait a minute, this is in violation of my First Amendment rights or my rights under RLUIPA or whatever. These were the folks that were involved from the department staff in making this decision, and this is the type of remedy I'm seeking. Those are very different avenues within the department's process. But the other incongruity is that you go for an 819 accommodation all the up. Three different levels. Final level is the regional person. And for 804, it starts with an in-house low-level person. It doesn't make sense that you would have to go down and do something in addition to 819 when it tells you you can't reapply for a year and you have to start with this low-level person. You've already started with a low-level person, went up, and then all the way up to the regional area. I understand that argument, Your Honor. Respectfully, I disagree. The purpose of the grievance process... But if you're in that position, what do you... You're saying to yourself, what do I do? I'm asking you a practical question, not so much a legal one now. You mean if I were the person who was now reviewing the grievance? You asked for religious accommodation and ultimately it was denied. I would file a grievance because if I'm an inmate, I know that if there are issues that I don't agree with in the prison, decisions that I don't agree with, that is my avenue to challenge those decisions. But why does the grooming say file a grievance? You used the word, I think, interwoven. Is it because in the grooming realm, the grievance happens in the middle of the process rather than as an appeal at the end? Yes, and I think that that was cautionary on the side of the a particular type of pendant, or services, or something of that nature. And that request has to go through the accommodation process. And if they're denied and they grieve, and the grievance process at some point in there changes that denial and says, well, actually he should have gotten the pendant because the measurements were wrong or something like that, then you can reverse that. But if you have a grooming accommodation and the inmate's request to be able to have an exemption from the length of hair is denied and his hair is cut, well, it's already done. It's a time sensitivity thing then. Yes. An urgency thing about the grooming. Okay. Yes, and the lack of ability to reverse that decision once it's made. Okay, and then there is no appeal from the grooming. You can't file a grievance after the grooming procedure has run its course because the grievance is interwoven, as you said. That's right. They would have already taken advantage of that opportunity to grieve. Okay. But that's not this case, right? Right, right. It's not our case, but the language in 819 says if it is grooming, you do have to go back to 804 in connection with in order to complete exhaustion. It's silent with respect to non-grooming. Ms. Albron says that you look to the canon of interpretation, nocitura socius, if you want to use the Latin word to one to exclude the others, that seems like a pretty good canon to use here. Your Honor, all of the case law, including Ross v. Blake, which was an 8-0 opinion out of the United States Supreme Court, reflects the position that the courts are to look at the language of the department's grievance policy and the circumstances surrounding the situation to determine if the inmate was able to use the grievance process. It was available to him on the books, right? And if we assume that it's available on the books, then we move to the unavailability assessment. Even though 819 is silent and somehow we're told that you have to use 804 for grooming, my question to you doesn't relate to that. My question to you relates to why is that canon inapplicable here? I'm not sure the canon that you're referring to, Your Honor. You say that you have to go to 804 with respect to grooming. It excludes the requirement to go to 804 for non-grooming. Your Honor's correct that it's silent that the 804 is triggered once the accommodation process is complete. So why is the canon inapplicable? That's my question. The fact that it's silent does not negate the fact that the 804 grievance process was available to Mr. Simmons. He chose not to avail himself of it. He admits that. In all of the cases that apply to this type of scenario of opaqueness or unavailability, you have a situation where the inmate, specifically in Ross v. Blake, he was claiming an excessive force claim and there was this other process for the prison to review those claims. There were facts in that case that suggested not only did the department's policy, grievance policy, call out this other process for but there were suggestions to that inmate that he ought to follow those other policies with regard to not filing a grievance. None of that is here. What we have is one policy relating to accommodations that is silent on whether an inmate ought to grieve afterwards or not. Isn't Ross v. Blake's talk about ambiguity, then keep going in order to make sure that you exhaust, dot your i's, cross your t's. That's right. Where's the ambiguity here? The ambiguity lies in the lack of unavailability. He knew about the 804. He chose not to file under the 804. No department staff told him not to file under the 804. The policy itself did not exempt religious accommodations from the 804 process. There are some listed. But 819 for non-grooming says to come back, you've got to wait a year. With regard to a new religious accommodation request, yes. To reapply for the same one, I would think, too, right? Doesn't 819 talk about reapplication? Sure, yes, Your Honor. An inmate could reapply for the same request. Is it your view that the district court was correct when it held that Simmons was required to file a grievance over the denial of his religious accommodation? Yes, Your Honor. And I think Ross v. Blake makes that very clear. The U.S. Supreme Court overturned the Fourth Circuit decision that held that some sort of special circumstances may exist for an inmate's failure to exhaust, and therefore he doesn't have to exhaust. Mr. Simmons is asking for that special circumstances test to be adopted here, and it's been squarely rejected by the U.S. Supreme Court. No further questions. All right. Thank you very much, Mr. Vermeer. We'll hear rebuttal from Ms. Aubry. Two quick points, Your Honor. First, medical defendants misconstrued the claim that we made in our initial brief. We're not disputing the course of treatment for Mr. Simmons' asthma, but rather that medical defendants were deliberately indifferent to his serious medical need of asthma, as demonstrated by their failure to follow their own health care policies. As to the second point, if Your Honors have no more questions, I'll move to the second point with respect to corrections defendants. My colleague agrees with us that there is no written requirement to use 804, and that, in fact, the grooming and non-grooming distinction holds, that it was, in fact, deliberate, that there's a reason why grooming has an 804 component and non-grooming doesn't. That may be about timing, but it doesn't change the fact that it was unwritten, and this Court made clear in small that an unwritten requirement is unavailable. It's not a special circumstances exception. Under Ross, it is the practical reality of a prisoner not being able to know that he should do something if he's not told he should do it. That's very clear on the language of 819. He exhausted, as a matter of law, simply by using 819 alone, and it was a parallel process, but if that was not the case... What about the argument that for grooming, the grievance being interwoven supports the DOC's position because that's what's after, typically. You know, if you have to pursue your rights under 819, you don't file a grievance in the middle of that process. You run the course of 819, and then if you don't like the result, then you grieve, but for grooming, why wasn't Attorney Trovinger's explanation reasonable to say, well, when you've got a time-sensitive thing like the cutting of hair, etc., that has to be dealt with on an urgent basis, and that's why the grievance appears sooner in the process for grooming than the non-grooming. I see my time is up. The fact that it was written in the policy, the fact that it is sensible, that it makes sense, that DOC did that, doesn't change the fact that it's not written there for 819, so it's not a matter of whether it's sensible or not. It's a matter of whether it was in the text of the policy. All right, so your argument comes down to saying it's unavailable because there wasn't an explicit directive that at the end of the 819 process, if you don't like the result, file a grievance. You think there had to be sort of a plain statement in 819 directing your client to grieve? Yes, Your Honor, and just to put a perfectly fine point on that, 819 is a parallel process on its text alone, so separate from this question of availability. It's only if this court thinks that as a matter of law he didn't exhaust using 819 alone that we then are concerned about the unavailability of the scheme and it's unavailable because it was unwritten. Okay, all right, do you want to address further at all anything relating to why the medical appellees, the three persons who treated your client after the spraying were somehow deliberately indifferent? Yes, Your Honor, the medical appellees are medical staff at the prison where Mr. Simmons was pepper sprayed, and the Department of Corrections maintains a policy for ensuring that prisoners with asthma are not pepper sprayed. But these are like people who came in lately, if you will. They were not part of the authorization process for the use of pepper spray. They are treating an individual, in this case, who came in to them afterwards, the next morning after being found unconscious, and then they had pepper sprayed him, but they were not involved in anything relating to that. They were involved in treatment afterwards. In what way did they treat him that was so much of malpractice that it was deliberately indifferent? Respectfully, Your Honor, two points on that. The first being I don't believe my colleague raised the issue of their personal involvement in responding to our argument, and that we are not disputing on appeal any course of treatment subsequent to pepper spraying, but rather their failure to adhere to their policy to protect inmates from being pepper sprayed. But how could they, after the fact, adhere to a policy when they were not the ones that gave the authorization? Medical staff is required to screen a prisoner upon entry to facility. Mr. Simmons' medical records were replete with evidence that he had asthma. But there were two other individuals involved in that process, whether or not one for the initial pepper spray and one for the second. Again, separate from the incident, separate from the pepper spray, this is a question of adherence to the policy, which is to screen them for not to be precluded from being pepper sprayed in the first instance, and to then be consulted for any use of force subsequent. I mean, it sounds like you're through the back door trying to make a Monell claim that somehow there's a policy or custom that people have to do something, and it's really the institution that should be held liable as opposed to the individuals. These three individuals, I should say. To that point, your honor, Mr. Simmons put this before the district court, both in his amended complaint and in his brief in opposition to the summary judgment, raising specifically this issue of failure to ensure screening under this policy, and that is circumstantial evidence of their deliberate indifference to his condition of asthma. That's a toughie. Okay, thank you. Okay, thank you, your honors. We respectfully request that this court reverse the district court's grant of summary judgment and remand for further proceedings. Thank you, Ms. Auburn, and thank you, Ms. Seabrooks and Ms. Trovino. The court will take the matter under advisement, and before I let you go, on behalf of the court, I want to thank the Temple University Clinic. I want to thank Attorney Levy, supervising attorney. I know I speak for my colleagues when I say that if it didn't say on the brief or in this law student, we would have no idea that you were law students. You're well on your way to being outstanding advocates in the court, so we're grateful for your help. We're grateful for the briefing on behalf of the matter under advisement.